IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ADRIENNE MEYERS and
VALERIE FITZSIMMONS,

      Plaintiffs,

vs.                                      Civ. No.  08-163 JP/WDS

GOODRICH CORPORATION,
a foreign corporation,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Each of the Plaintiffs has asserted three claims of violations of Title VII:

1.  Exposure to a hostile work environment;

2.  Gender discrimination; and

3.  Retaliation for engaging in protected activity.

The Court concludes:

1. With respect to their hostile work environment claims, the Plaintiffs had to present evidence that was sufficient to permit a jury to decide the claims and this involved confronting three legal hurdles.  The Plaintiffs easily cleared the first hurdle by providing strong evidence that they worked in a testosterone-charged hostile environment.  Likewise, Plaintiffs made it over the second hurdle by producing enough evidence that the Defendant had actual or constructive knowledge of the hostile work environment.  However, Plaintiffs stumbled when trying to leap the final hurdle and failed to submit evidence, sufficient to create a genuine issue of material fact, about whether Defendant's remedial efforts were inadequate.

2.  In regard to Plaintiffs' claim of gender discrimination, Plaintiffs came up with a paucity of evidence and failed to show either a *prima facie* case of gender discrimination or that Defendant's reasons for not promoting Plaintiffs were pretextual.

3.  As to Plaintiffs' retaliation claims, Plaintiffs also failed to submit adequate evidence to establish a *prima facie* case or to create a genuine issue of material fact of pretext as to Defendant's reason why it would not allow Plaintiff Meyers to work part time or its reason why it declined to rescind Plaintiff Fitzsimmons's resignation.

Consequently, the Court must grant Defendant's Motion for Summary Judgment on all claims.[1]

On December 11, 2008, Defendant Goodrich Corporation filed Defendant's Motion for Summary Judgment on Claims Brought by Plaintiff Adrienne Meyers (Doc. No. 45) and Defendant's Motion for Summary Judgment on Claims Brought by Plaintiff Valerie Fitzsimmons (Doc. No. 47).  On February 26, 2009, the Court held a pretrial conference at which Theresa Parrish represented Plaintiffs, and Barbara Stephenson and Quentin Smith represented Defendant.  Counsel presented oral argument at the pretrial conference on the motions for summary judgment.  Counsel also clarified their arguments later by submitting letters to the Court with specific citations to the record.  Having heard the oral argument of counsel at the pretrial conference and having reviewed the briefs and letters submitted by counsel as well as the relevant law, the Court determines that the motions for summary judgment should be granted and that Defendant is entitled to summary judgment on all of the Plaintiffs' claims.

---

[1]The Court is disturbed that, in view of the record in this case and the case law by which it is constrained, it cannot grant a remedy to these Plaintiffs who, as young women working in a male-dominated environment, were subjected to rather disgusting treatment by male co-workers.

**A.  Factual Background**

      This is a Title VII employment discrimination case.  Defendant employed Plaintiffs, both females, at its Space Flight Systems engineering and manufacturing plant in Albuquerque, New Mexico.  Plaintiff Meyers was an electronics technician I and Plaintiff Fitzsimmons was an engineering technician I.  Both had the same supervisor, Jim Molleur.  Plaintiffs contend that they resigned from their employment as a result of sexual harassment in the form of a hostile work environment, gender discrimination, and retaliation.  The facts discussed below, where disputed, are those most favorable to the Plaintiffs.

      **1.  Plaintiff Meyers**

          **a.  Chronology of Events**

      Plaintiff Meyers applied in December 2004 for a job at Defendant's plant as an electronics technician.  She was hired as an electronics technician I to work with the Global Positioning Satellite (GPS) Team.  On her first day of work, Plaintiff Meyers was given Defendants' personnel policies and procedures and was told she could access those policies and procedures online.  She also received a booklet, *Code of Business Conduct*, which had a section on discrimination and sexual harassment.  In addition, she received an *Employee Guide* that had a section on discrimination and sexual harassment.  Plaintiff Meyers subsequently received a pamphlet containing phone numbers for Human Resources (HR) and a toll-free third-party HelpLine available 24/7 for employees to report discrimination or harassment.

      After Plaintiff Meyers had worked for about four or five months, Rick Buckner, a member of the GPS team, yelled at Plaintiff Meyers and "chased" her around the lab because he did not agree with what she was doing.  He also grabbed Plaintiff Meyers's arm at one point.  She reported the incident to HR.

On July 5, 2005, Plaintiff Meyers received her first performance review.  Her overall performance rating was "developmental," and Molleur noted that Plaintiff Meyers was "making improvements" and that she was "a quality technician."  Ex. H (attached to Memorandum in Support of Motion for Summary Judgment on Claims Brought by Plaintiff Adrienne Meyers (Doc. No. 47), filed Dec. 11, 2008 (hereinafter Memorandum in Support I)).  Plaintiff Meyers agreed to the review and signed it.

On February 23, 2006, Plaintiff Meyers received her second performance review.  Her overall performance rating was "fully competent," and Molleur wrote that she "is developing into a good technician.  Her skills have shown a steady amount of improvement over the past year. [She] is becoming a valuable asset to Goodrich."  Ex. I (attached to Memorandum in Support I).  Plaintiff Meyers again agreed to the review and signed it.

During the last week of March 2006, Molleur was out-of-town and had assigned Lee Kemp (a member of the GPS team) as acting supervisor in Molleur's absence.  On March 29, 2006, Kemp "chased" Plaintiff Meyers and yelled at her because he thought she was taking excessive breaks and socializing with coworkers.  Plaintiff Meyers then emailed Kemp early that afternoon stating that she had a dentist appointment later that week and asked if she needed a doctor's excuse.  About a half hour later Kemp responded by email advising that Plaintiff Meyers did not need a doctor's excuse, but cautioning her that she should not socialize, take extra or long breaks, or talk on the phone.  Plaintiff Meyers testified that this made her feel "threatened."   She responded by email to Kemp late that afternoon saying coworkers also socialized and that Molleur and HR were aware of that activity.  Depo. of Adrienne Meyers at 127, Ex. A (attached to Memorandum in Support I).

At about 11:30 p.m. the night of March 29, 2006 Plaintiff Meyers called the HelpLine to complain that in June 2005 and again in September 2005 she had submitted her resume to a supervisor for a promotion to an electrical engineering job and had received no response. Plaintiff Meyers also complained that women were "being sexually harassed by rude comments and jokes."  Ex. K (attached to Memorandum in Support I).  Plaintiff Meyers did not provide any details or names with respect to her claim of sexual harassment because she was afraid of something bad happening.  She also assumed that this allegation of sexual harassment would prompt an investigation by Defendant.

At about 7:00 a.m. on March 30, 2006,  Kemp responded to Plaintiff Meyers's last email from the day before, copying it to Molleur and HR.  Kemp stated that he would send Plaintiff Meyers's last email to Molleur and that he expected Plaintiff Meyers to work except for two breaks and lunch.  Kemp noted that Plaintiff Meyers has a "work habit issue" and should make "a pointed effort to stay focused on completing the task at hand."  Ex. J (attached to Memorandum in Support I).

Forty-five minutes later, Plaintiff Meyers emailed Molleur stating that Kemp was "threatening, demeaning, and he embarrassed me."  Ex. L (attached to Memorandum in Support I).  At about 3:30 p.m. that day, March 30, Molleur responded to Plaintiff Meyers by email stating that he would talk to Kemp in the morning and telling Meyers to stay out of Kemp's way. Molleur also directed Plaintiff Meyers to go to Kellee Vernon in HR if things got out of control. Plaintiff Meyers subsequently called and spoke with Molleur; and Plaintiff Meyers testified that this phone call took care of her concerns with Kemp.

On April 19, 2006, Plaintiff Meyers spoke with HelpLine personnel to follow up her previous HelpLine call.  She reported that "her concerns have been resolved through local

Human Resources" and that "her concern regarding sexual harassment was unsubstantiated and again, she would report concerns to local management and Human Resources."  Ex. K (attached to Memorandum in Support I).

On April 20, 2006, Plaintiff Meyers met with the Albuquerque HR director, Bill Dorn, about her not being promoted and her concerns with Kemp.  She told Dorn that she did not feel harassed by Kemp and that the issue was resolved when she spoke with Molleur.  Dorn invited Plaintiff Meyers to come back if she had any further trouble with Kemp.  Dorn also told Plaintiff Meyers that if she wanted a promotion to an electrical engineering job she needed a Bachelor of Science degree in electrical engineering or she could work five to seven years as an electronics technician to gain on the job experience.  Plaintiff Meyers did not have a Bachelor of Science degree in electrical engineering and had been an electronics technician at Defendant's plant for less than a year and a half.[2]  She was satisfied with Dorn's explanations about job titles.

On June 12, 2006, Dorn followed up with an email to Plaintiff Meyers reiterating the qualifications for a position as an electrical engineer.  Dorn also noted that Defendant had not hired an entry level electrical design engineer since Plaintiff Meyers began working at Defendant's plant.

On June 18, 2006, Plaintiff Meyers emailed Molleur informing him of her decision to resign and pursue a Master's Degree.  Plaintiff Meyers noted that she was "having trouble keeping up with the work schedule and [her] class work."   Ex. O (attached to Memorandum in Support I).  She further stated that: "As we discussed, Goodrich is unable to accommodate a part-time schedule (until October, 2006).  Therefore, I am resigning my position as a full-time employee."  *Id.*  Plaintiff Meyers continued: "I have enjoyed my time at Goodrich and have

---

[2]Plaintiff Meyers had a Bachelor of Science degree in electronics engineering technology.

learned immensely from the GPS team as well as from other departments. ...  Thanks for being a great leader; I have enjoyed working with you and the GPS team." *Id.*  Plaintiff Meyers testified that for the most part these remarks regarding her positive work experience were not true and that she made them in order to get a good reference.  Depo. of Adrienne Meyers at 172-74, Ex. A (attached to Memorandum in Support I).  Also, at about this time, Plaintiff Meyers reported to HR staff member Bea Hanson that Defendant had a big problem with sexual harassment and needed to look into the GPS team.  Depo. of Adrienne Meyers at 266-67, Ex. 1 (attached to Plaintiff Meyers's Response to Defendant's Motion for Summary Judgment (Doc. No. 53), filed Jan. 9, 2009). Plaintiff Meyers did not give Hanson any examples of sexual harassment or names of workers who had engaged in sexual harassment.  *Id.* at 267.

### b.  Additional Allegations

At some point during her employment, Plaintiff Meyers sought part-time work at Defendant's plant and some person, who Plaintiff Meyers did not identify, had told her that Jeff Clemens had been permitted part-time work.  Dorn testified, however, that typically there was no part-time work available.  Depo. of Bill Dorn at 108, Ex. 2 (attached to Plaintiff Meyers's Response to Defendant's Motion for Summary Judgment).

In addition, Plaintiff Meyers testified that she believed Molleur sexually harassed her on at least a weekly basis by laughing at jokes which she believed (or assumed) were sexual in nature. Depo. of Adrienne Meyers at 251-252, Ex. 1 (attached to Plaintiff Meyers's Response). Plaintiff Meyers, however, conceded that she did not know the content of the jokes at which Molleur laughed.  *Id.* at 252.  Plaintiff Meyers admitted she never heard Molleur tell an inappropriate joke.  *Id.* at 251.  Molleur also sometimes touched Plaintiff Meyers's shoulder and punched Plaintiff Meyers's arm a couple of times.  *Id.*

Plaintiff Meyers further alleges that throughout her employment at Defendant's plant Buckner and Mike Armijo (another coworker on the GPS team), would intermittently send her offensive emails with jokes about women or sex.  Depo. of Adrienne Meyers at 51-53, Ex. A (attached to Memorandum in Support I).  She apparently never asked Buckner or Armijo to stop the emails nor did she report them to a supervisor or to HR.  *Id*. at 52-53.  Plaintiff Meyers does not specifically recall the content of those emails.  *Id*. at 52.

Plaintiff Meyers also alleges that Buckner on more than one occasion made sexually suggestive comments to her about having sex and about the size of her breasts.  Depo. of Adrienne Meyers at 116-117, 119, Ex. 1 (attached to Plaintiff Meyers's Response).  Again, these comments were not reported to a supervisor or to HR although Plaintiff Meyers made it clear to Buckner that she already had a boyfriend.

Additionally, Plaintiff Meyers testified that sometime in the middle of 2006 Buckner once "bent me over a desk and pretended he was having sex with me."  Depo. of Adrienne Meyers at 113, Ex. A (attached to Memorandum in Support I). Christian Espinoza witnessed this behavior and later told Plaintiff Meyers he would never say he saw that occur.  Depo. of Adrienne Meyers at 262, Ex. 1 (attached to Plaintiff Meyers's Response).  Moreover, Buckner touched her shoulder and grabbed her arm on more than one occasion.  *Id*. at 118.  He also hugged her once.  *Id*. at 119.  Furthermore, on "maybe two" occasions, Buckner called her on the phone at work acting like he was masturbating. *Id*.  at 259-60.  Plaintiff Meyers did not report these incidents to a supervisor or to HR but did advise Buckner that she was already in a monogamous relationship.

With respect to Armijo, Plaintiff Meyers alleges that he often discussed women and sex at the office, and he had pictures of partially clad women on his computer.  *Id*. at 192-94.

Plaintiff Meyers told Armijo he was "crossing the line" but he did not stop. *Id*. at 195. Plaintiff Meyers did not report these incidents to a supervisor or to HR.

Nevertheless, Plaintiff Meyers would go to happy hour with Armijo and Buckner once or twice a week during her 18 month employment with Defendant. *Id*. at 65-67. Plaintiff Meyers even invited Armijo, Buckner, and others to have beer at her new house. *Id*. at 284. Plaintiff Meyers admitted that she also engaged in the joking and used profanity at work. *Id*. at 191-92. She complains that the last time she went to a bar with Buckner and Armijo, Armijo unzipped his pants and pulled out his penis. *Id*. at 298. Plaintiff Meyers did not report that incident to a supervisor or to HR. *Id*.

Plaintiff Meyers testified that she did not report the behavior of Buckner and Armijo because she was afraid and did not trust Dorn with respect to handling a sexual harassment complaint. Depo. of Adrienne Meyers at 223-24, 263-4, Ex. 1 (attached to Plaintiff Meyers's Response). Plaintiff Meyers's perception of Dorn was based on several reasons. First, Dorn pushed a cart containing two female HR staff members who were provocatively dressed at Defendant's Christmas party. *Id*. at 263. Second, Dorn and his staff had published a sexually provocative joke in the April 7, 2006 company newsletter for which Dorn later issued an apology to the employees and withdrew the newsletter from Defendant's website. *See* Newsletter at 2 for content of joke, Ex. A (attached to Complaint for Damages for Violations of Title VII (Doc. No. 1), filed Feb. 12, 2008). A high ranking official with Defendant further told Dorn that he should give himself a verbal warning, the first step of the Performance Improvement Program, for publishing that joke in the newsletter. Finally, Dorn had not investigated any gender discrimination complaints since he began working at Defendant's plant in December 1998, and the only sexual harassment complaints he investigated were Plaintiff Meyers's. Depo. of Bill

Dorn at 14, Ex. 2 (attached to Plaintiff Meyers's Response).

Plaintiff Meyers also contends that on one occasion she was deliberately left to work with faulty test equipment.  Depo. of Adrienne Meyers at 212-13, Ex. A (attached to Memorandum in Support I).  In addition, she contends that on separate occasions someone inappropriately left the door ajar on the chamber of her equipment for her shift and turned off the liquid nitrogen valve on her chamber.  Depo. of Adrienne Meyers at 294-95, Ex. 1 (attached to Plaintiff Meyers's Response).

## 2.  Plaintiff Fitzsimmons

### a.  Chronology of Events

Plaintiff Fitzsimmons began work at Defendant's plant on March 1, 2004 as an engineering technician I on a project referred to as Delta 4.  On her first day of work, Plaintiff Fitzsimmons was given Defendant's personnel policies and procedures and was told she could access those policies and procedures online.  She also received a booklet, *Code of Business Conduct*, which had a section on discrimination and sexual harassment.  In addition, she received an *Employee Guide* that had a section on discrimination and harassment.  Finally, Plaintiff Fitzsimmons knew how to contact HR and was aware of the toll-free third-party HelpLine.

On September 2, 2004, Plaintiff Fitzsimmons received her first performance review.  Molleur rated Plaintiff Fitzsimmons as fully competent in the category of "action oriented" and otherwise rated her as developmental.  Molleur noted, however, that Plaintiff Fitzsimmons "has a problem with socializing when she should be working.  After letting her know this is unacceptable she has been performing at a much higher standard."  Ex. J (attached to Memorandum in Support of Motion for Summary Judgment on Claims Brought by Plaintiff Valerie Fitzsimmons (Doc. No. 54), filed Jan. 9, 2009 (hereinafter Memorandum in Support II)).

Plaintiff Fitzsimmons agreed to the review and signed it.  She later testified that she did not agree with the comment about her socializing and verbally tried to get Molleur to change that comment.  Depo. of Valerie Fitzsimmons at 106, Ex. A (attached to Memorandum in Support II).

On February 9, 2005, Plaintiff Fitzsimmons sent an email to Molleur in which she called him a "Fuss Puppy" and wrote: "Don't forget, butt breaks at 20 min. intervals can stop the 'numb a–' feeling and replenish circulation to the brain."  *Id*. at 167-68, Ex. A.  She attached to the email a joke titled "New Drugs for Women" that, for instance, defined "Peptobimbo" as a "liquid silicon drink for single women" and instructed that "two full cups swallowed before an evening out increases breast size, decreases intelligence, and prevents conception."  *Id*. at 170-72.  Plaintiff Fitzsimmons thought this was a funny joke.

On February 24, 2005, Plaintiff Fitzsimmons received her second performance review in which she was rated as fully competent in most categories.  In reviewing her interpersonal skills, Molleur noted that Plaintiff Fitzsimmons's "demeanor with others is professional even in difficult situations but she occasionally needs assistance to diffuse difficult interpersonal situations.  Her tendency to communicate openly and completely is sometimes misinterpreted as loitering.  Sometimes disrupts other workers with jokes and small talk."  Ex. K (attached to Memorandum in Support II).  Plaintiff Fitzsimmons testified that this comment was made with respect to one incident in which a coworker told her that her picture of sleeping puppies looked like "dead puppies."  Depo. of Valerie Fitzsimmons at 121-23, Ex. A (attached to Memorandum in Support II).  Plaintiff Fitzsimmons became upset that the coworker was somehow commenting on her parenting skills. Plaintiff Fitzsimmons agreed to the second review and signed it.

On April 20, 2005, Plaintiff Fitzsimmons sent another email joke to Molleur.  This one stated: "There are those people who seem to 'chap my a–' or were you the one that's 'grate.' Mom said it's your turn to clean the bathroom."  Ex. H (attached to Memorandum in Support II). The email was signed "PITA (Pain in the Ass)" and had a picture of a cheese grater in the form of a roll of toilet paper.  *Id*.

On January 30, 2006, Plaintiff Fitzsimmons received a third performance review.  Her overall performance rating was fully competent although she was rated as developmental as to schedule performance.  Molleur noted in the third review that Plaintiff Fitzsimmons "started a training session with the two techs mentioned.  She was teaching them basic electronics.  She has not continued these lessons for several months."  Ex. L at 1 (attached to Memorandum in Support II).  Plaintiff Fitzsimmons testified that she refused to train the technicians because they had the same job classification she had.  Depo. of Valerie Fitzsimmons at 135, 137, Ex. A (attached to Memorandum in Support II).  However, Molleur also stated that Plaintiff Fitzsimmons "is a good technician.  Once she has the appropriate experience with our hardware I believe she will advance quickly."  Ex. L at 2 (attached to Memorandum in Support II).  Plaintiff Fitzsimmons agreed to the review and signed it.

After the January 30, 2006 performance review, Plaintiff Fitzsimmons was transferred from Delta 4 to the Ground Midlevel Defense (GMD) project, a project similar to Delta 4. Molleur was also a supervisor for the GMD project.  Plaintiff Fitzsimmons felt the transfer was made in retaliation for her comment to coworkers and Molleur that a romantic relationship between her Delta 4 project manager, Kelly Hedges, and another manager, Ted Goodhue, was inappropriate.  Plaintiff Fitzsimmons did not report this concern through the use of any of Defendant's policies and procedures. The only substantive difference between Plaintiff

Fitzsimmons's new GMD position and the old one at Delta 4 was that she worked at night, a situation she actually preferred.  Depo. of Valerie Fitzsimmons at 158 and 176, Ex. A (attached to Memorandum in Support II).  In fact, except for emails, the transfer to the GMD project resulted in the end of Plaintiff Fitzsimmons' exposure to what she considered to be inappropriate conduct.  *Id*. at 181.

 On February 27, 2006, Plaintiff Fitzsimmons sent an email to Molleur in which she wrote: "I'm sure we don't need a 'F' incident of any kind and this could lead to 'F' words on my part and no one needs to know–I do use them when shock or pain happens."  Ex. I (attached to Memorandum in Support II).  Somewhat curiously, Plaintiff Fitzsimmons claims that "F" referred to "failure."  Depo. of Valerie Fitzsimmons at 179, Ex. A (attached to Memorandum in Support II).

On March 17, 2006, Molleur gave Plaintiff Fitzsimmons a Written Reminder based on three instances where she failed to follow instructions for testing equipment.  Ex. M (attached to Memorandum in Support II).  Plaintiff Fitzsimmons initially acknowledged and signed the Written Reminder.  Plaintiff Fitzsimmons later disagreed with the Written Reminder because she believed that the failures were equipment failures and not her fault.  Depo. of Valerie Fitzsimmons at 188, Ex. 1 (attached to Plaintiff Fitzsimmons's Response).  Plaintiff Fitzsimmons, however, did not file a grievance with HR nor did she submit a rebuttal.  Plaintiff Fitzsimmons felt that HR would ignore her since HR had refused to take her documentation when she approached HR about a promotion to an engineering technician II position. Depo. of Valerie Fitzsimmons at 190, Ex. A (attached to Memorandum in Support II).  Plaintiff Fitzsimmons further testified that Don Wilson and Mark Wadleigh told Molleur that Plaintiff Fitzsimmons should not have received a Written Reminder because the test set had a problem.

Depo. of Valerie Fitzsimmons at 188, Ex. 1 (attached to Plaintiff Fitzsimmons's Response). In

fact, according to Plaintiff Fitzsimmons, both Wilson and Wadleigh had blown up units and had

not been reprimanded. *Id*. at 240.

On March 28, 2006, Plaintiff Fitzsimmons received this email from coworker Bill Beske:

A WOMAN'S PLACE

Barbara Walter's of 60 Minutes (USA) did a story on gender roles in Kabul several years
before the Afghan conflict. She noted that women customarily walked about 5 paces
behind their husbands. She returned to Kabul recently and observed that women still
walk behind their husbands, but now seem to walk even further back and are now happy
with the old custom. Ms. Walters approached one of the Afghani women and asked,
"But why do you now seem happy with the old custom that you used to try and change."
"Land mines," said the woman.

Ex. N (attached to Memorandum in Support II). Plaintiff Fitzsimmons testified that this email

offended her because it was "sexist" and "degrades an entire group of women in a different

culture and a different society." Depo. of Valerie Fitzsimmons at 183-84, Ex. A (attached to

Memorandum in Support II). She forwarded the email to Molleur and stated: "Your [sic] not

here and I have to put up with this type of garbage. I was thinking that if I'm here at night I can

stay away from this stuff but somehow someone thinks I need to be degraded. I let Mr [sic]

Baughman know about this because I'm not sure what to do with this and your [sic] not here."

Ex. N (attached to Memorandum in Support II). Plaintiff Fitzsimmons ended the email by

stating: "Help me, Please [sic]." *Id*.

On the morning of March 29, 2006, Plaintiff Fitzsimmons submitted a letter of

resignation to an HR employee, Bea Hanson, which stated: "It has been a great opportunity to

work with everyone at Space Flight Systems, but I have decided to return to school." Ex. O

(attached to Memorandum in Support II). Hanson asked Plaintiff Fitzsimmons to think about the

resignation and to get back to her. After lunch, Plaintiff Fitzsimmons told another HR

employee, Kellee Vernon, that she wanted to rescind the resignation.  On April 4, 2006, HR

director Dorn met with Plaintiff Fitzsimmons and discussed her desire to be an engineering

technician II. Depo. of Valerie Fitzsimmons at 203, Ex. A (attached to Memorandum in Support

II). They also discussed the Written Reminder, and they may have discussed the Afghan email.

*Id*. at 204-05.  With respect to the Written Reminder, Plaintiff Fitzsimmons indicated men were

not being written up.  *Id*. at 205.  Plaintiff Fitzsimmons, however, did not raise the issue of

equipment failure with Dorn.  *Id*.  Dorn asked Plaintiff Fitzsimmons to reconsider the

resignation. Ex. Q (attached to Memorandum in Support II).  Plaintiff Fitzsimmons agreed to

reconsider her resignation.  *Id*.

At 10:18 p.m. on April 4, 2006, Plaintiff Fitzsimmons sent an email to Ted Goodhue

asking him to consider "dropping" her request to resign since it was her understanding that

Goodhue was "the one to talk to about staying on."  *Id*.  The next morning, April 5, 2006,

Goodhue responded with an email asking to set up a meeting with Plaintiff Fitzsimmons and

possibly Vernon "to discuss [Plaintiff Fitzsimmons'] 2 week notice and hear [her] side of the

story."  Ex. R (attached to Memorandum in Support II).  Goodhue noted he was available to

meet April 6, 2006 at 7:00 a.m. or earlier.

Then, after midnight during the early morning hours of April 6, 2006, Plaintiff

Fitzsimmons called the HelpLine to complain about the March 17, 2006 Written Reminder.

Plaintiff Fitzsimmons also told HelpLine personnel that Goodhue has a "personal agenda to

terminate her" because she questioned the romantic relationship Goodhue had with Hedges.

(Goodhue and Hedges married in March or April 2006).  Ex. S at 2 (attached to Memorandum in

Support II).  Plaintiff Fitzsimmons further told HelpLine personnel that she had concerns with

Goodhue's management of the GMD department.  *Id*.  Plaintiff Fitzsimmons conceded in her

testimony that this HelpLine call was not a complaint of sexual harassment or gender discrimination.  Depo. of Valerie Fitzsimmons at 223, Ex. A (attached to Memorandum in Support II).

Plaintiff Fitzsimmons met with Goodhue on April 6, 2006.  Goodhue informed Plaintiff Fitzsimmons that he had accepted her resignation and she could not rescind it. The next day, in a follow-up call to the HelpLine, Plaintiff Fitzsimmons indicated the Goodhue refused to rescind her resignation because of her "questionable work habits" and the fact that she talks too much. Ex. S at 3 (attached to Memorandum in Support II). Plaintiff Fitzsimmons noted in the call that Molleur had stated in her reviews that she talks too much and he had often stated that "all women talk too much." *Id*.; Depo. of Valerie Fitzsimmons at 212, Ex. A (attached to Memorandum in Support II).  Nonetheless, Plaintiff Fitzsimmons noted in the HelpLine call that she continued to receive salary increases after each of her performance reviews.  Plaintiff Fitzsimmons further stated in the call that she believed Molleur and Goodhue "have personally degraded her and attempted to lower her self-esteem."  Ex. S at 2 (attached to Memorandum in Support II).  As an example, Plaintiff Fitzsimmons noted that Goodhue told her that "several of her colleagues accused her of poor work performance."  *Id*.  Plaintiff Fitzsimmons also stated in the call that Goodhue intended to force all of the engineering technicians like her to resign so he could replace them with engineers.  Finally, Plaintiff Fitzsimmons accused Molleur of making "sexist statements and has had to take classes to address his negative attitude against women." *Id*.  She further observed in the call that Molleur told another woman, Jordan Armstrong, that "he wasn't going to hire any more women because all they want to do is move furniture around." *Id*.  This statement was apparently witnessed by a male employee.  *Id*.

Plaintiff Fitzsimmons testified that Molleur's statements about women talking were made "constantly" since she started working at Defendant's plant and that she confronted him about it. Depo. of Valerie Fitzsimmons at 212, Ex. A (attached to Memorandum in Support II).  Plaintiff Fitzsimmons further testified that Molleur made statements "all the time" about how "women were not good enough for anything except moving furniture."  *Id*. at 214.  In addition, Plaintiff Fitzsimmons testified that Molleur made statements "all the time" which implied that the reason she was only an engineering technician I was due to her gender.  *Id*. at 215.

On April 7, 2006, Dorn published an HR newsletter that contained a sexually offensive joke.  On April 11, 2006, Plaintiff Fitzsimmons made an anonymous call to the HelpLine to complain about the inappropriate newsletter Dorn sent out.  Dorn withdrew that newsletter from Defendant's website and apologized to the employees.  Dorn also received a verbal warning.  Plaintiff Fitzsimmons admits in her testimony that the newsletter "issue was not part of [her] resignation" and that Defendant took action on the inappropriate newsletter.  *Id*. at 227.

### b.  Other Allegations

Plaintiff Fitzsimmons alleges that right after she began working at Goodrich she made verbal complaints on a "regular basis" to Molleur about sexual harassment including computer images of scantily clad women. *See* Depo. of Valerie Fitzsimmons at 103, Ex. A (attached to Memorandum in Support II).  Plaintiff Fitzsimmons did not report these concerns to HR.

Plaintiff Fitzsimmons also alleges that during her employment Sonny Johnson, a maintenance coworker in another unit, touched her on the calf "almost on a daily basis" more than "a hundred times" despite being told by Plaintiff Fitzsimmons to stop.  Moreover, Johnson wrapped his arm around Plaintiff Fitzsimmons many times and the day before she resigned Johnson stuck his tongue in Plaintiff Fitzsimmons's ear.  *Id*. at 247-48.  Plaintiff Fitzsimmons

apparently did not tell Johnson to stop hugging her but did tell him to stop touching her leg.

Depo. of Valerie Fitzsimmons at 254-55, Ex. 1 (attached to Plaintiff Fitzsimmons's Response).

Plaintiff Fitzsimmons further alleges that Johnson made verbal remarks implying that he wanted

to perform sexual acts with her.  Depo. of Valerie Fitzsimmons at 256, Ex. A (attached to

Memorandum in Support II). Plaintiff Fitzsimmons did not report any of this conduct to a

supervisor or to HR.

Furthermore, shortly after starting work with Defendant, Plaintiff Fitzsimmons attempted

to get a promotion to an engineering technician II position by trying to give her certificates and

transcripts to Molleur and Vernon who both refused to accept that documentation.  However,

Plaintiff Fitzsimmons did not apply for any open positions.  *Id*. at 53-54.

Finally, Plaintiff Fitzsimmons testified that Buckner had also hugged her when she first

started work at Defendant's plant.  Depo. of Valerie Fitzsimmons at 262, Ex. 1 (attached to

Plaintiff Fitzsimmons's Response).  No managers witnessed this hugging by Buckner and

apparently Plaintiff Fitzsimmons did not report it to her supervisor or to HR or to anyone else.

### 3. Testimony of Coworker Irene Robles

Plaintiffs also present the testimony of coworker  Irene Robles to corroborate their

allegations of sexual harassment.  Irene Robles, an assembler and receiving inspector at

Defendant's plant from 1998 to 2007, testified that when she complained to HR about

disciplinary action taken against her, those complaints went unaddressed.  Robles had also

experienced a coworker repeatedly asking her out on dates.  This coworker, however, ceased this

behavior after a supervisor talked to him; Robles did not report these incidents to HR.

Moreover, Robles contends she was touched (lifted up) by coworker Sonny Johnson in front of a

group of employees and that he made "all kinds of remarks" about women.  Depo. of Irene

Robles at 72, Ex. 3 (attached to Plaintiff Meyers's Response).  Robles further heard Buckner (in the break room), Armijo (in the tech area), and Molleur making sexually explicit comments.  *Id.* at 59, 74, and 82-85.  In addition, Robles had spoken with both Plaintiffs during smoking breaks and had seen both Plaintiffs crying during their breaks regarding how the men had treated them. *Id.* at 54-55, 89, and 91. Robles testified that Plaintiff Meyers had complained to her about Buckner groping her, sending her an inappropriate email, and making comments to her.  *Id.* at 55-56, and 59.  Robles also testified that Plaintiff Fitzsimmons stated that Johnson had harassed her.  *Id.* at 91.

**B.  Standard of Review**

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the nonmovant. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party bears the initial burden of showing the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "[A] movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim. ... Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)(citing *Celotex*, 477 U.S. at 323).  Once "the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational

trier of fact could find for the nonmovant.  To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. (citations omitted).

## C. Discussion

### 1. Hostile Work Environment

Defendant argues first that it is entitled to summary judgment on the Plaintiffs' hostile work environment claims.  To demonstrate a hostile work environment based on sexual harassment, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and that the victim was targeted 'because of her gender.'" *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007)(citation omitted).  In determining if a plaintiff has met this burden, the court "consider[s] the work atmosphere both objectively and subjectively, ... look[ing] at all the circumstances from the perspective of a reasonable person in the plaintiff's position." *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 680 (10th Cir. 2007)(internal quotation marks and alterations omitted).  "Factors to consider include the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007)(citation omitted).  Implicit in these elements of a hostile work environment is that the harassment was unwelcomed by the plaintiff. *Id*. at 1186.

### a.  **Plaintiff Meyers**

#### (1)  Severe or Pervasive Harassment

Defendant argues first that Plaintiff Meyers cannot establish a hostile work environment because the alleged harassment was not sufficiently severe or pervasive under the circumstances. As an example, Defendant cites to *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257 (10th Cir. 1998), *cert. denied*, 526 U.S. 1039 (1999), where the Tenth Circuit held that the following actions were not sufficiently severe or pervasive: two plaintiffs alleged that, over a three year period, their supervisor made five sexually suggestive comments, gave hotel clerks the impression they were staying in the same room, took them to Hooters, insisted one of them work in his hotel room, followed one of the plaintiffs constantly when she went to the bathroom, and touched them on several occasions.  Defendant claims that the actions in this case do not rise to the levels of those in *Penry*.  The Court finds Defendant's attempt at reasoning by analogy unpersuasive because the severe or pervasive determinations necessarily depend on the particular facts in each case.  *See Harsco Corp.*, 475 F.3d at 1187 (a "mechanical comparison of a few strategically selected facts is precisely the type of analysis [the Tenth Circuit] has rejected.").

Defendant also argues that the allegation of Buckner's simulated sex with Plaintiff Meyers is not enough to establish sufficiently severe harassment.  Defendant cites to *Jones v. Potter*, 301 F.Supp.2d 1, 11 (D.D.C. 2004) where the court found that a supervisor rubbing his penis against plaintiff's buttocks was "not severe enough to constitute a hostile working environment."  In addition, Defendant argues that Armijo's exposure at a bar is not enough to establish sufficiently severe sexual harassment, citing *Pirie v. Conley Group, Inc.*, 2004 WL 180259 *12 (S.D. Iowa)(coworker exposing penis for three minutes was not sufficiently severe to show hostile work environment) and *Durkin v. City of Chicago*, 199 F.Supp.2d 836, 850-51

(N.D. Ill. 2002)(coworker unzipping pants and tell plaintiff "suck this" was "insufficiently severe to constitute sexual harassment").

In response, Plaintiff Meyers argues that all of the incidents she complains of, when taken together, are sufficiently severe or pervasive to support a claim of hostile work environment.  Viewed separately and in isolation, the Buckner simulated sex and Armijo's exposure at a bar, while certainly disgusting, may not be enough to be considered "pervasive" or perhaps even "severe."  However, when these two very inappropriate events are taken into account together with the other incidents involving Plaintiff Meyers (intermittent inappropriate emails from Buckner and Armijo, sexually based comments and jokes by Buckner and Armijo, the obscene joke in Defendant's newsletter, computer pictures of scantily clad women, Buckner's phone calls regarding masturbation, and Dorn's actions at the Christmas party) and this evidence is then considered in the light most favorable to Plaintiff Meyers, a jury could rationally find that a reasonable person in Plaintiff Meyer's position would have believed that all of these actions in combination constituted severe or pervasive sexual harassment, i.e., a hostile work environment.[3]  *See PVNF, L.L.C.*, 487 F.3d at 798-99 (the "totality of the circumstances" test is the "touchstone" of the hostile work environment analysis).  Although Plaintiff Meyers has presented sufficient specific evidence of a hostile work environment, she must also show that

---

[3]Defendant asserts that the Court should not consider Robles's testimony in determining the existence of a hostile work environment.  *See Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 171 (10th Cir. 1996)("Although 'evidence of general work atmosphere, including evidence of harassment of other women, may be considered in evaluating a claim' of sexual harassment, the plaintiff 'may only rely on evidence relating to harassment of which she was aware during the time she was allegedly subject to a hostile work environment.'")(citation omitted).  Since the Court has concluded that Plaintiff Meyers presented sufficient specific evidence of a hostile work environment by virtue of the sexual harassment she personally experienced, there is no need to address the issue of whether the Court should also consider Robles's testimony in determining if Plaintiff Meyers worked in a hostile environment.

Defendant is liable under Title VII for that hostile work environment.

### (2)  Employer Liability

For an employer to be liable under Title VII for sexual harassment by a plaintiff's co-workers, the plaintiff must show that 1) the employer had actual or constructive knowledge of the harassment, and 2) the employer's remedial and preventative responses to any actual or constructively known harassment were inadequate.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

### (a) Employer's Actual Knowledge of Harassment

Defendant contends that Plaintiff Meyers has not met the actual knowledge requirement because she did not report sexual harassment to management even though she had several avenues to do so.  *See Ford v. West*, 222 F.3d 767, 776 (10th Cir. 2000)(actual knowledge shown by reports of harassment to management). Defendant is correct.  Plaintiff Meyers did not make any complaints directly to her supervisor, Molleur, or to HR Director Dorn about sexual harassment.  Plaintiff Meyer's only documented report of sexual harassment consisted of vague allegations of inappropriate comments and jokes made to the HelpLine on March 29, 2006 which Plaintiff Meyer's concedes she later characterized to the HelpLine personnel as "unsubstantiated."[4]

---

[4]About the time Plaintiff Meyers resigned she also complained generally to Hanson in HR about sexual harassment within the GPS team.  Plaintiff Meyers does not specify the date this one complaint was made nor does she elaborate on any details of the complaint.  Moreover, Plaintiff Meyers has not presented evidence that Hanson was in a management position.  Consequently, the Court cannot conclude, based on the evidence presented by Plaintiff Meyers, that she carried her burden of demonstrating that Hanson had actual knowledge that GPS team members Armijo and Buckner had been sexually harassing Plaintiff Meyers and that this actual knowledge could be imputed to Defendant by virtue of a non-management employee.

Plaintiff Meyers contends, however, that because HR made Robles and Plaintiffs feel it was futile to complain to HR, Defendant was on actual notice of the sexual harassment. Plaintiff Meyers cites to *Harsco Corp.*, 475 F.3d at 1188, to support this contention. In *Harsco*, management's reluctance to respond to complaints of sexual harassment occurred multiple times. Here, Plaintiff Meyers obtained satisfaction from management when she complained about sexual harassment by calling the HelpLine on one occasion. Furthermore, there is no evidence that Robles ever complained to HR about sexual harassment. On the other hand, Plaintiff Fitzsimmons presented testimony that she complained of sexual harassment on a "regular basis" directly to Molleur who supervised both Plaintiffs. *See* Depo. of Valerie Fitzsimmons at 103, Ex. A (attached to Memorandum in Support II). The Court is allowed to consider the testimony of coworkers regarding notice of sexual harassment if they describe sexual harassment which has the "similarity and nearness in time" of the sexual harassment alleged by the plaintiff. *See Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1165 (10th Cir. 2008)(quoting *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 783-84 (10th Cir. 1995)). Plaintiff Meyers is entitled to the benefit of Plaintiff Fitzsimmons's testimony. Plaintiff Meyers has, therefore, presented enough specific evidence to create a genuine question of material fact as to whether Defendant had actual knowledge of sexual harassment in the workplace by way of the information Plaintiff Fitzsimmons imparted to Supervisor Molleur as management's representative.

### (b) Employer's Constructive Knowledge of Harassment

Next, Defendant contends that because the alleged harassment was not particularly pervasive, the evidence fails to support an inference that it had constructive knowledge of sexual harassment against Plaintiff Meyers. Plaintiff Meyers argues to the contrary that Defendant had

24

constructive knowledge of the hostile work environment by virtue of the severity and pervasiveness of the sexual harassment in the workplace as testified to by Plaintiffs.  To meet the constructive knowledge requirement, Plaintiff Meyers must show that "the acts of harassment are 'so egregious, numerous, and concentrated as to add up to a campaign of harassment'...." *Adler*, 144 F.3d at 673 (citation omitted).  In other words, to show constructive knowledge, Plaintiff Meyers must present specific evidence that "highly pervasive harassment should, in the exercise of reasonable care, [have been] discovered by management-level employees." *Id.* Defendant contends that Plaintiff Meyers does not meet this high burden, citing *Smith v. Beverly Health & Rehab. Servs., Inc.*, 978 F.Supp. 1116, 1122 (N.D. Ga. 1997)(four to five episodes of harassment during four month period not enough to infer employer knowledge).

In this case, Plaintiff Meyers has presented specific evidence that joking and comments regarding sexual matters (including emails), inappropriate touching, and computer pictures of scantily clad women were prevalent in the workplace for all to hear and see. *See, e.g., Mack v. ST Mobile Aerospace Engineering, Inc.*, 195 Fed. Appx. 829, 841 (11th Cir. 2006)(constructive knowledge found where harassing behavior took place in an "open workplace"); *Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999)(constructive knowledge found where harassing behavior was "open and pervasive"); *Wilson v. Chrysler Corp.*, 172 F.3d 500, 509 (7th Cir. 1999), *overruled on other grounds by Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795 (1999)(constructive knowledge found where harassing behavior is in open view in a public or common area of the workplace).  Robles corroborated Plaintiff Meyers's allegations by testifying about the public sexual joking by Armijo in the tech room and by Buckner in the break room, public touching by Johnson, and inappropriate comments by Molleur, a management level

25

employee.[5]  Additionally, Plaintiff Fitzsimmons presented evidence regarding Buckner's

hugging, Molleur's inappropriate comments, and inappropriate computer images.  Both Plaintiffs

testified about the sending of inappropriate emails.  Moreover, the simulated sex act by Buckner

probably took place in a public area since it was witnessed by another employee.  Also, Dorn,

another management level employee, engaged in what could reasonably be considered sexually

inappropriate behavior at the company Christmas party and in publishing the obscene joke in the

company newsletter, both incidents having occurred in an open public forum.  Viewing the

evidence most favorably to Plaintiff Meyers, the Court believes a jury could rationally find that,

in the exercise of reasonable care, management level employees should have discovered at the

very least pervasive sexual harassment.

### (c) Employer's Remedial Action

Defendant argues that even if it had actual or constructive knowledge of sexual

harassment against Plaintiff Meyers, it provided prompt remedial action to the sexual harassment

Plaintiff Meyers claims to have experienced.  The test for determining the adequacy of the

remedial response to harassment is "whether the remedial and preventative action [is] reasonably

calculated to end the harassment."  *Adler*, 144 F.3d at 676 (internal quotation marks omitted).

"'Because there is no strict liability and an employer must only respond reasonably, a response

---

[5]The Court previously concluded that there was no need to decide if it should consider
Robles's testimony in the context of determining whether Plaintiff Meyers presented sufficient
evidence of a hostile work environment.  *See supra* fn. 3.  To establish a hostile work
environment, Plaintiff Meyers could only rely on evidence of harassment of which she was
aware of.  *See Creamer*, 86 F.3d at 171.  However, in the context of establishing whether
Defendant had knowledge of the hostile environment, Plaintiff Meyers is allowed to present the
testimony of coworkers if that testimony has "the similarity and nearness of time" of the
harassment alleged by the plaintiff.  *See Tademy*, 520 F.3d at 1165.  Robles's testimony is
sufficiently similar and near in time to the harassment alleged by Plaintiff Meyers that this Court
can consider it in deciding the knowledge issue.

may be so calculated even though the perpetrator might persist.' A plaintiff who argues that continuing harassment demonstrates the inadequacy of the employer's response must offer evidence of 'a nexus between a[n employer's] prior response and later harassment by others.' If the employer's action does not stop the harassment, then this court examines its adequacy in light of 'the timing of the employee's complaint, the speed of the employer's response, and the gravity of the punishment relative to the alleged harassment.'" *Tademy*, 520 F.3d at 1165-66 (citations omitted).

  Defendant contends that its actions with respect to Plaintiff Meyers's reference to sexual harassment in the initial HelpLine call were "reasonably calculated to end harassment" because Plaintiff Meyers, in fact, reported back to the HelpLine on April 19, 2006 that "her concern about sexual harassment was unsubstantiated" and she seemed otherwise satisfied with the resolution of the problems she had with Kemp.  Because Plaintiff Meyers's initial HelpLine call did not name specific individuals who allegedly engaged in sexual harassment, and there is no evidence to the contrary, it can be reasonably assumed that the initial HelpLine call impliedly referred to inappropriate conduct by both Armijo and Buckner.  It can further be assumed, then, that Plaintiff Meyers's followup call retracting her allegations of sexual harassment necessarily retracted any allegations of sexual harassment by Armijo and Buckner.  The Court also notes that in the followup call to the HelpLine, Plaintiff Meyers stated that if she had any more concerns about sexual harassment, presumably by Armijo or Buckner, she would report her concerns to local management and HR, which she never did. Moreover, Dorn made it clear to Plaintiff Meyers that if she had any other problems with Kemp to come and see him, which she did not do.  Also, Defendant provided prompt remedial action with respect to Dorn's publication of the obscene joke in Defendant's newsletter by having Dorn apologize to the employees,

withdraw the newsletter from Defendant's website, and administer a verbal warning.  In sum,

Defendant has presented evidence that it provided prompt remedial action to Plaintiff Meyers's

complaints of sexual harassment by Armijo, Buckner, and Dorn.

Under the summary judgment standard, the burden now shifts to Plaintiff Meyers, the

party who would bear the burden of persuasion at trial, to refer to specific admissible facts in the

record from which a rational trier of fact could find that Defendant's actions did not constitute

prompt remedial action.  Plaintiff Meyers, however, has utterly failed to meet this burden by

failing to refer to any specific admissible evidence in the record on the issue of adequate

remedial response or to even argue against Defendant's position on this issue.  As the Tenth

Circuit has stated:

> Indeed, the requirement that the nonmovant specifically reference facts in its motion
> materials and the record is of special importance in an employment discrimination case.
> Unlike the archetypical automobile accident, these cases typically involve numerous
> incidents over long periods of time, numerous documents (including elaborate policies,
> handbooks, and manuals), and lengthy depositions of the plaintiff, supervisor, managers,
> fellow employees, and physicians. Thus, where the burden to present such specific facts
> by reference to exhibits and the existing record was not adequately met below, we will
> not reverse a district court for failing to uncover them itself.

*Adler*, 144 F.3d at 672.  In other words, it is not the Court's obligation to take up the

nonmovant's burden of combing the record for specific evidence and making the nonmovant's

case.  *Id*.  Since Plaintiff Meyers has failed to carry her burden under the summary judgment

standard, Defendant is entitled to summary judgment on the sexual harassment claim.

Although Defendant is otherwise entitled to summary judgment on the sexual harassment

claim and the Court is not obligated to analyze this claim any further, the Court will assume for

the sake of argument that Plaintiff Meyers is somehow implicitly arguing that continuing

harassment, at least from April 19, 2006 (the date of the follow up HelpLine call) onward, is

evidence of an inadequate remedial response by Defendant.  To succeed on this argument,

Plaintiff Meyers must refer to specific "evidence of 'a nexus between a[n employer's] prior

response and later harassment by others." *Id*.  Plaintiff Meyers has not even made this argument

in her brief nor has she referred the Court to specific admissible evidence in the record to show

the requisite nexus.  Therefore, Plaintiff Meyers has again failed to carry her burden under the

summary judgment standard.  Hence, Defendant is entitled to summary judgment regarding

Plaintiff Meyers's claim of sexual harassment or hostile work environment.

### b.  Plaintiff Fitzsimmons

### (1)  Severe or Pervasive Harassment

Defendant argues that Plaintiff Fitzsimmons has failed to produce evidence that she

experienced severe or pervasive sexual harassment.  Defendant contends that the Court should

disregard the allegations that Johnson touched Plaintiff Fitzsimmons's calf multiple times and

wrapped his arm around her several times because those were innocuous actions not related to

the sex of either Plaintiff Fitzsimmons or Johnson.  Leaving out the leg touching and hugging,

Defendant argues that the exposure to indecent computer images, Johnson's inappropriate

remarks, and the tongue incident taken together occurred over a two year period and so cannot

be considered pervasive.  Defendant also argues that the tongue incident was not severe because

it was an isolated incident of touching.[6]

The Court determines that a reasonable jury would be hard pressed to conclude that being

touched on the calf more than "a hundred times" and being hugged numerous times is innocuous

_____

[6]Defendant further claims that the allegations concerning Plaintiff Fitzsimmons are
similar to the circumstances in the *Penry* case in which no hostile work environment was found.
As the Court has already determined, Defendant's attempt at reasoning by analogy is
unpersuasive.  *See Harsco Corp.*, 475 F.3d at 1187.

and not sexually offensive to a woman.  Moreover, viewing the evidence in the light most favorable to Plaintiff Fitzsimmons and taking into account the calf touching and hugging incidents together with the computer pictures of scantily clad women, with Supervisor Molleur's "constant" comments about women talking too much and being only good for moving furniture, with Moelleur's remarking "all the time" that Plaintiff Fitzsimmons was only an engineering technician I because of her gender, with Johnson's sexually related comments, with Johnson putting his tongue in Plaintiff Fitzsimmons' ear, and with Buckner's bear hug, the Court concludes that a reasonable jury could easily find that there was a severe or pervasive hostile work environment.[7]  *See PVNF, L.L.C.*, 487 F.3d at 798-99 (the "totality of the circumstances" test is the "touchstone" of the hostile work environment analysis).  Although Plaintiff Fitzsimmons has presented sufficient specific evidence of a hostile work environment, she must

---

[7]Defendant again asserts that the Court should not consider Robles's testimony in determining the existence of a hostile work environment.  *See Creamer*, 86 F.3d at 171.  As with Plaintiff Meyers, the Court has concluded that Plaintiff Fitzsimmons presented sufficient specific evidence of a hostile work environment by virtue of the sexual harassment she personally experienced.  Hence, there is no need to address the question of whether the Court should consider Robles's testimony in deciding if Plaintiff Fitzsimmons worked in a hostile environment.

also show that Defendant is liable under Title VII for that hostile work environment.[8]

### (2)  Employer Liability

### (a) Employer's Actual Knowledge of Harassment

Defendant contends that Plaintiff Fitzsimmons has not shown that Defendant had actual knowledge of sexual harassment against her because Plaintiff Fitzsimmons never reported sexual harassment by a coworker to a supervisor or to HR.  Plaintiff Fitzsimmons, on the other hand, asserts that the Defendant had actual notice of sexual harassment because Molleur, a supervisor and management level employee, "knew of, participated in, and otherwise acquiesced in the sexually charged atmosphere in the workplace."  Plaintiff Fitzsimmons's Response to Defendant's Motion for Summary Judgment at 12. Plaintiff Fitzsimmons has presented undisputed evidence that she complained to Molleur about sexual harassment on a "regular basis," about the computer images of scantily clad women, and about the Afghan joke, which in

---

[8]In addition to arguing that Plaintiff Fitzsimmons was not subjected to severe or pervasive sexual harassment, Defendant argues that Plaintiff Fitzsimmons was not subjected to "unwelcome" harassment and, hence, she has not shown that she worked in a hostile environment.  Defendant notes that because Plaintiff Fitzsimmons participated in sending sexist emails and using profanity, her subsequent concerns about the Afghan email and the Dorn newsletter should not be considered unwelcomed by Plaintiff Fitzsimmons.  Defendant cites to *Burns v. Snow*, 130 Fed. Appx. 973, 985 (10th Cir. 2005) in which the Tenth Circuit found that viewing the plaintiff's supervisor's conduct together with plaintiff's own acquiescence and participation in inappropriate behavior as well as "the entire social context in which such conduct occurred ... the circumstances presented in this case did not cause [plaintiff] to experience a severely hostile or abusive work environment."  *See also Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)("A plaintiff must indicate by her conduct that the harassment was unwelcome, and evidence that she 'engaged in behavior similar to that which she claimed was unwelcome or offensive' is evidence that the behavior is not unwelcome.").  The undisputed record indicates that Plaintiff Fitzsimmons sent one email containing a sexist joke called "New Drugs for Women," a somewhat crude email signed by "PITA," and an email referring to the "F" word which Plaintiff Fitzsimmons explained, strangely, was a reference to the word "failure."  Considering this rather limited evidence together with the ample evidence of sexual harassment and viewing it in the light most favorable to Plaintiff Fitzsimmons, the Court still concludes that a reasonable jury could find that Plaintiff Fitzsimmons experienced a hostile work environment.

her opinion was "sexist" and degrading to women.  Although Plaintiff Fitzsimmons did not present any specific evidence that Defendant actually knew that Johnson was touching her leg or had put his tongue in her ear, Plaintiff Fitzsimmons testified that she made "regular" complaints of sexual harassment to Molleur, her supervisor. This testimony is sufficient at the summary judgment stage to create a genuine issue of material fact as to whether Defendant, at the very least, should have known that Johnson inappropriately touched Plaintiff Fitzsimmons on multiple occasions.  Moreover, the computer images were apparently displayed in open view of the employees as well as management working in that area.  Plaintiff Fitzsimmons further presented evidence that her supervisor Molleur himself "constantly" made statements about women talking too much even though Plaintiff Fitzsimmons confronted Molleur about those statements, and that Molleur made statements "all the time" about how women are only good for moving furniture.  He also made comments "all the time" implying that Plaintiff Fitzsimmons was only an engineering technician I because of her gender.  Viewing this undisputed evidence in the light most favorable to Plaintiff Fitzsimmons, the Court believes that a reasonable jury could find that Defendant had actual knowledge of sexual harassment in Plaintiff Fitzsimmons's workplace.

### (b) Employer's Constructive Knowledge of Harassment

Defendant also argues that it did not have constructive knowledge of sexual harassment against Plaintiff Fitzsimmons because the pervasiveness of the alleged harassment was not sufficient enough to have put it on notice of the harassment.  Plaintiff Fitzsimmons asserts, however, that her testimony and the testimony of Robles and Plaintiff Meyers provide sufficient evidence of constructive knowledge by Defendant of a hostile work environment. Although it is unclear from the evidence whether the incidents involving Plaintiff Fitzsimmons and Johnson

occurred in an open public area, Robles's testimony regarding how Johnson had lifted her up in public and how Johnson apparently openly made remarks about women in the office support Plaintiff Fitzsimmons's argument that Defendant had at least constructive notice of sexual harassment as to Johnson's touching as well as his inappropriate remarks.[9]  Moreover, Robles corroborated Plaintiff Fitzsimmons's allegations concerning Molleur's inappropriate comments and Buckner's inappropriate office behavior.  Plaintiff Meyers's testimony further supports Plaintiff Fitzsimmons's assertion of constructive notice of sexual harassment.  Plaintiff Meyers testified about the presence of inappropriate computer images and described how Buckner engaged in offensive behavior in the workplace like sending inappropriate emails, making inappropriate comments, hugging Plaintiff Meyers and grabbing her arm and touching her shoulder, and even pretending to have sex with Plaintiff Meyers, repulsive conduct witnessed by a coworker.  The Court concludes that Plaintiff Fitzsimmons has presented sufficient specific evidence from which a reasonable jury could find that Defendant had constructive knowledge of sexual harassment in Plaintiff Fitzsimmons's workplace.

### (c) Employer's Remedial Action

Defendant argues that if it had been put on any kind of notice of sexual harassment perpetrated against Plaintiff Fitzsimmons, it provided adequate remedial efforts to end that harassment.  Defendant contends that it responded promptly and appropriately to Dorn's obscene joke in the newsletter within two days by having Dorn withdraw the newsletter from the Defendant's website, having Dorn apologize to the employees, and by issuing a verbal warning

---

[9]As with Plaintiff Meyers's constructive knowledge argument, Plaintiff Fitzsimmons can rely on Robles's testimony regarding notice because her testimony is similar and near in time to Plaintiff Fitzsimmons's allegations of sexual harassment.  *See Tademy*, 520 F.3d at 1165.

to Dorn.  Notably, Plaintiff Fitzsimmons does not contest that Defendant took adequate remedial action with respect to the newsletter joke.

Next, then, is whether Defendant took appropriate remedial action regarding Molleur's sexist conduct.  Plaintiff Fitzsimmons testified that Molleur made derogatory comments about women "all the time" without specifying the inclusive days he did this. The evidence is undisputed that Molleur attended classes to address his negative attitude toward women, as noted by Plaintiff Fitzsimmons in her April 7, 2006 follow up HelpLine call.  This constituted reasonable remedial action on Defendant's part to prevent Molleur from making sexist comments.  Hence, Defendant carried its initial burden under the summary judgment standard of demonstrating that it provided adequate remedial action regarding Molleur's sexist comments.

The burden then shifts to Plaintiff Fitzsimmons to refer to specific admissible facts in the record from which a rational juror could find that Defendant did not provide adequate remedial action regarding Molleur's comments.  Plaintiff Fitzsimmons, however, has failed to refer to any evidence or to even argue that there is a genuine issue of material fact regarding whether Defendant's actions constituted an "adequate" remedial response to Molleur's inappropriate comments.  As noted previously, the Court is not obligated to make Plaintiff Fitzsimmons's case for her. Since Plaintiff Fitzsimmons failed to carry her burden under the summary judgment standard, Defendant is necessarily entitled to summary judgment regarding Plaintiff Fitzsimmons's claim of sexual harassment by Molleur.

Although the Court does not need to continue its analysis on the issue of sexual harassment by Molleur, it will do so for the sake of argument.  Assuming that Plaintiff Fitzsimmons is arguing by some kind of implication that continuing harassment by Molleur demonstrates that the classes he attended were not an adequate remedial response, she also "must

34

offer evidence of 'a nexus between a[n employer's] prior response and later harassment by others.'" *Tademy*, 520 F.3d at 1166 (quoting *Adler*, 144 F.3d at 678).  Furthermore, "[i]f the employer's action does not stop the harassment, then this court examines its adequacy in light of 'the timing of the employee's complaint, the speed of the employer's response, and the gravity of the punishment relative to the alleged harassment.'" *Id*. at 1166 (citation omitted).  In this case, Plaintiff Fitzsimmons has not referred to any specific evidence of a nexus with respect to Molleur's attendance of classes and any continuing misogynistic comments by Molleur.  There is simply no evidence regarding specific dates and times when Molleur attended these classes and no evidence concerning the temporal relationship of those classes to Plaintiff Fitzsimmons's complaints about Molleur which are also unspecified as to time.  Additionally, Plaintiff Fitzsimmons failed to produce any evidence, including dates, regarding the speed of Defendant's response, i.e., how quickly or slowly Defendant directed Molleur to take the classes.  Plaintiff Fitzsimmons did not produce any evidence regarding the content of the classes so that the Court could determine the relevancy of the classes to Plaintiff Fitzsimmons's complaints.

Moreover, Plaintiff Fitzsimmons has failed to refer to specific evidence or to argue why her reassignment to the GMD project was not an adequate remedial action by Defendant with respect to inappropriate behavior by Molleur (comments), Johnson (comments and leg touching), and Buckner (bear hug) as well as with respect to the occurrence of indecent computer images. Plaintiff Fitzsimmons specifically testified that except for emails the "inappropriate conduct" stopped when she was reassigned to the GMD project.  Depo. of Valerie Fitzsimmons at 181, Ex. A (attached to Memorandum in Support II).  Plaintiff Fitzsimmons, however, does not specify when that transfer occurred; the time frames in which the inappropriate behaviors by Molleur (comments), Johnson (comments and leg touching), and Buckner (bear hug) occurred; the time

frame in which the indecent computer images occurred; or even what "inappropriate conduct" she was referring to.  In the absence of other contradictory evidence, it can reasonably be assumed that the "inappropriate conduct" which Plaintiff Fitzsimmons testified ceased after her transfer to the GMD project included the bad behavior engaged in by Molleur (comments), Johnson (comments and leg touching), and Buckner (bear hug), and the indecent computer images.  In addition, the only email Plaintiff Fitzsimmons received subsequent to her reassignment that she felt was demeaning to women was the Afghan joke which was not particularly offensive and can easily be seen as a joke on men, not women.  The only other post-reassignment incident supported by the evidence was the loathsome conduct of Johnson who held Plaintiff Fitzsimmons and put his tongue in her ear just prior to her resignation. Plaintiff Fitzsimmons, however, does not refer to specific evidence in the record from which a rational jury could find that the transfer to the GMD project was somehow not "reasonably calculated" to prevent sexual harassment of the nature Johnson unfortunately engaged in subsequent to the transfer.  Plaintiff Fitzsimmons also did not offer specific evidence of a nexus between the transfer to the GMD project and the later detestable harassment by Johnson. Since the repulsive tongue-in-ear incident happened just before Plaintiff Fitzsimmons resigned and was not reported to Defendant, obviously Defendant had no reason or time to take action regarding that specific misconduct.  To summarize, Plaintiff Fitzsimmons has failed to carry her burden under the summary judgment standard of referring to specific evidence from which a reasonable jury could find that Defendant did not respond adequately to the sexual harassment of which it had either actual or constructive notice.  Hence, Defendant is entitled to summary judgment on the hostile work environment claim.

**2. Gender Discrimination**

Next, Defendant argues that it is entitled to summary judgment on Plaintiffs' gender discrimination claims.  Plaintiff Meyers contends that she was discriminated against based on gender when Defendant failed to promote her to an electrical engineer position. Plaintiff Fitzsimmons asserts that she was discriminated against based on gender when Defendant failed to promote her to an engineering technician II position. To establish gender based discrimination with respect to a failure to promote,

> a plaintiff must show that his employer intentionally discriminated against him for a reason prohibited by the statute. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1178 (10th Cir.2004) ("[Title VII] prohibits only intentional discrimination based upon an employee's protected class characteristics.") (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1319 (10th Cir.1992)). If the plaintiff relies upon circumstantial evidence, we apply the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish a prima facie case of discrimination by showing that "(1) he is a member of a protected class; (2) he applied for and was qualified for the particular position; (3) he was not promoted despite his qualifications; and (4) the position was filled or remained open after he was rejected." *Cross v. The Home Depot*, 390 F.3d 1283, 1286 (10th Cir.2004); *see also Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir.2003). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant carries its burden of production, the presumption of discrimination drops out of the case. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination. *Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir.2004).

*Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1306-07 (10th Cir. 2005)(footnote omitted).

### a.  Plaintiff Meyers

#### (1) *Prima Facie* Case of Gender Discrimination

Defendant argues that Plaintiff Meyers has not shown that she actually applied for an open position that was later filled or remained open after she was rejected.  The undisputed evidence shows that Plaintiff Meyers simply submitted unsolicited resumes.  *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2nd Cir. 2004)("the second element of a *prima facie* case cannot be established merely with evidence that a plaintiff generally requested promotion consideration.").  Defendant further asserts that even if Plaintiff Meyers had applied for an electrical engineer job, she would not have been qualified for that position based on her education and experience. Plaintiff Meyers did not produce any evidence raising a genuine issue of material fact on this point.  Consequently, Plaintiff Meyers has not demonstrated a *prima facie* case of gender discrimination.

#### (2) Pretext

Since Plaintiff Meyers failed to show a *prima facie* case of gender discrimination, the Court is not obliged to continue its gender discrimination analysis.  The Court will, nonetheless, address the subject of pretext raised by Defendant.  Defendant argues that Plaintiff Meyers's lack of adequate education and experience is a legitimate, nondiscriminatory reason for not hiring her as an electrical engineer and, therefore, there was no pretext.  Plaintiff Meyers did not address the issue of pretext by producing specific evidence designed to show a genuine issue of material fact regarding Defendant's nondiscriminatory reason. Hence, Defendant is entitled to summary judgment on Plaintiff Meyers's gender discrimination claim.

### b. Plaintiff Fitzsimmons

#### (1) *Prima Facie* Case of Gender Discrimination

Defendant also contends that Plaintiff Fitzsimmons did not meet the *prima facie* element of gender discrimination which requires that she apply for an open position.  Defendant is correct–Plaintiff Fitzsimmons submitted no evidence that she applied for an open position. Consequently, Plaintiff Fitzsimmons has failed to establish a *prima facie* case of gender discrimination.

#### (2) Pretext

Although it is unnecessary to continue with the gender discrimination analysis, the Court will address Defendant's arguments regarding pretext for the sake of completeness.  Defendant asserts that it was within its discretion not to unilaterally promote Plaintiff Fitzsimmons considering her short tenure and luke-warm performance reviews, and that Plaintiff Fitzsimmons has not shown that this legitimate, nondiscriminatory reason for failing to promote her amounted to pretext.  Plaintiff Fitzsimmons contends that pretext can be shown by the fact that a male employee was hired as an engineering technician II and the fact that she was asked to train two males who, like she, were engineering technician I's.  Plaintiff Fitzsimmons, however, did not provide any evidence regarding the circumstance of the hiring of the male engineering technician II and the reasons for needing to train the two male engineering technicians I from which a reasonable jury could find pretext.  Since Defendant has presented a legitimate, nondiscriminatory reason for not promoting Plaintiff Fitzsimmons and there is no admissible evidence that the reason was pretextual, Defendant will be granted summary judgment as to Plaintiff Fitzsimmons's gender discrimination claim.

### 3.  Retaliation

Finally, Defendant asserts that it is entitled to summary judgment on Plaintiffs'
retaliation claims.  "A *prima facie* case of retaliation requires a plaintiff to show (1) that she
engaged in protected opposition to discrimination, (2) that a reasonable employee would have
found the challenged action materially adverse-that is, that the action might 'dissuade[] a
reasonable worker from making or supporting a charge of discrimination,' and (3) that a causal
connection exists between the protected activity and the materially adverse action."  *PVNF,
L.L.C.*, 487 F.3d at 803 (citations omitted).  Once the *prima facie* case is met, the employer must
"proffer a legitimate, nondiscriminatory reason for the adverse action."  *Id.* at 804.  Once the
employer has proffered "a legitimate, nondiscriminatory reason for the adverse action," the
burden shifts to the employee "to demonstrate that the proffered reasons for the actions are
pretextual."  *Id.*

#### a.  Plaintiff Meyers

##### (1)  *Prima Facie* Case of Retaliation

Plaintiff Meyers claims retaliation by not being allowed to work part-time until October
2006 and by having test equipment tampered with.  Defendant contends first that there is no
evidence of a causal connection between any alleged protected activity by Plaintiff Meyers and
the alleged adverse action by Defendant, i.e., Defendant's decision to not allow Plaintiff Meyers
to begin part-time work until October 2006.  Defendant argues that Plaintiff Meyers cannot
establish any close temporal proximity between the protected activity and the adverse action
since she cannot even specify when the supposed adverse actions occurred in relation to her
protected activity.  The Court agrees with Defendant. Second, Defendant correctly asserts that
being left with faulty or tampered equipment did not amount to an adverse employment action in

this case because it did not result in discipline or other consequences. *See also Evans-Gadsen v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F.Supp.2d 386, 400-01 (S.D.N.Y. 2007)(sabotage is not an adverse employment action for retaliation purposes). Consequently, Plaintiff Meyers has not produced evidence of a *prima facie* case of retaliation.

### (2)  Pretext

The Court need not continue its retaliation analysis after concluding that Plaintiff Meyers failed to provide evidence establishing a *prima facie* case. The Court will, however, briefly address the pretext issue. Defendant states that its legitimate, nondiscriminatory reason for not offering Plaintiff Meyers part-time employment was that a supervisor has the right to make employee assignments. In fact, the record indicates that typically there was no part-time work available. Plaintiff Meyers argues that pretext can be shown by presenting hearsay evidence, vague as to time and reason, that Defendant allowed a male employee to work part-time. Defendant maintains that Plaintiff Meyers's allegations of a male being allowed to work part-time are simply speculative and not indicative of pretext. The Court agrees with Defendant. Plaintiff Meyers has failed to produce specific admissible evidence which would indicate that Defendant's decision to not offer Plaintiff Meyers part-time work until October 2006 was pretextual in nature. Defendant is, therefore, entitled to summary judgment on Plaintiff Meyers's retaliation claim.

### b.  Plaintiff Fitzsimmons

### (1) *Prima Facie* Case of Retaliation

Plaintiff Fitzsimmons contends that Goodhue did not rescind her resignation because she had complained about his relationship with Hedges. Defendant argues that Plaintiff Fitzsimmons's complaint about the romantic relationship between Goodhue and Hedges does not

constitute protected activity.  To support this proposition, Defendant cites to *Parker v. Otis Elevator Co.*, 2001 WL 502008 *2 (9th Cir.)(complaint about romantic relationship between supervisor and another employee is not protected by Title VII).  *Parker*, however, also held that "while favoritism based on a romantic relationship between a supervisor and an employee is not prohibited by Title VII, Appellant 'must only show that [he] had a "reasonable belief" that the employment practice [he] protested was prohibited under Title VII,' and he does not need to demonstrate that the employment practice was in fact illegal."  *Id*.  Here, the evidence shows that Plaintiff Fitzsimmons believed that the Goodhue-Hedges relationship "was a company conduct violation and she questioned the ethics of their relationship...."  Ex. S at 1 (attached to Memorandum in Support II).  She simply thought the relationship was "unacceptable."  Depo. of Valerie Fitzsimmons at 155, Ex. A (attached to Memorandum in Support II).  Plaintiff Fitzsimmons did not present specific evidence that she had a reasonable belief that the Goodhue-Hedges relationship somehow violated Title VII.  Hence, a reasonable jury could not find that a complaint about the Goodhue-Hedges relationship constituted protected activity.

        Even if the complaint about the Goodhue-Hedges relationship could be considered protected activity, there is no evidence showing that Goodhue knew about Plaintiff Fitzsimmons's complaint about him and Hedges at the time Goodhue declined to rescind Plaintiff Fitzsimmons's resignation.  In other words, Plaintiff Fitzsimmons has not shown that her complaint about Goodhue and Hedges was causally connected to Goodhue's decision to prevent Plaintiff Fitzsimmons from rescinding her resignation.  *See Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)("[P]laintiff must show that individual who took adverse action against him knew of the employee's protected activity.").  A reasonable jury, therefore, could not find that Plaintiff Fitzsimmons had established a *prima facie* case of retaliation.

### (2)  Pretext

Having found that Plaintiff Fitzsimmons failed to establish a *prima facie* case of retaliation, it is unnecessary to continue the retaliation analysis.  However, in the interest of a complete discussion of the retaliation claim, the Court will address the pretext issue. Defendant argues that it had a legitimate, nonretaliatory reason for Goodhue's decision to accept Plaintiff Fitzsimmons's resignation, namely that she had lukewarm performance evaluations.  In her response, Plaintiff Fitzsimmons simply did not argue or point to any evidence why a reasonable jury could find pretext as to her retaliation claim.  Consequently, Defendant is entitled to summary judgment on Plaintiff Fitzsimmons's retaliation claim.

**D. Conclusion**

Although the Court is convinced both Plaintiffs were treated boorishly and rudely because of their gender, the Court reluctantly concludes that Defendant is entitled to summary judgment on Plaintiffs' Title VII hostile work environment, gender discrimination, and retaliation claims.

IT IS ORDERED that:

1.  Defendant's Motion for Summary Judgment on Claims Brought by Plaintiff Adrienne Meyers (Doc. No. 45) is granted;

2.   Defendant's Motion for Summary Judgment on Claims Brought by Plaintiff Valerie Fitzsimmons (Doc. No. 47) is granted; and

3.   summary judgment will be entered in Defendant's favor on Plaintiffs' Title VII hostile work environment, gender discrimination, and retaliation claims which will be dismissed

with prejudice.


_____
SENIOR UNITED STATES DISTRICT JUDGE